## CIRCUIT COURT OF SPOTSYLVANIA COUNTY

Lester Jacobs,
Executor

v.

Betty Church

April 28, 1995

Case No. CH93-49

BY JUDGE WILLIAM H. LEDBETTER, JR.

The question presented is whether the Estate of Carrie Hewitt Jacobs can recover from Betty Church, a child of the decedent, monies that Church expended from her mother's funds for the mother's care.

### Factual Background

Carrie Jacobs died testate on July 11, 1992, survived by four children. The will, in which Jacobs left her property to her children in equal shares, was duly probated. Lester Jacobs, one of the children, qualified as executor. In that capacity, he instituted this suit against Betty Church, another of the four children.

Originally, the executor sought an accounting of all financial transactions undertaken by Church as attorney-in-fact for Jacobs under a power of attorney dated November 29, 1983. During the course of litigation, the focus narrowed to expenditures of the mother's funds for her care during the last illness, between August 6, 1990, and July 11, 1992.

Church did not act under the 1983 power of attorney until February 1988, when Jacobs asked her to handle her affairs as attorney-in-fact. There is no dispute that the instrument is valid and that Jacobs was competent at the time she executed it and at the time she asked Church to act under its authority.

In 1988, Jacobs lived alone at her home in Bealeton. All four of her children lived nearby and visited with her often. Because Jacobs was

beginning to suffer periods of confusion associated with senility, in-home sitters sometimes provided care.

In August 1989, Jacobs was hospitalized as the result of a fall. Her physicians noted that she had a developing Alzheimer's condition and suggested that she go to a health care facility upon her release from the hospital. Nevertheless, Church decided to take her mother home to live with her in Manassas. By that time, Jacobs could not live alone.

After another fall, Jacobs was hospitalized a second time. Upon her release, Church placed her in Potomac Point Geriatric Care Center to await an opening in the Alzheimer's care unit of Carriage Hill Nursing Home. She was at Potomac Point from October, 1989, until space became available at Carriage Hill the following month. She remained at Carriage Hill until August 6, 1990, when Church removed her. The circumstances surrounding the removal are detailed in the record. Questions about the quality of care appear to be the primary reason for Church's action. Jacobs went to live with Church again and stayed there until her death.

The other children visited their mother frequently when she was in the hospital and at the nursing home. They did not visit her in Church's home because they felt unwelcome. Therefore, although all the children had been attentive to Jacobs prior to August 1990, it is clear that Church alone provided care during the final two years of their mother's life.

The Alzheimer's had reached an advanced stage by the time Jacobs went to live with Church in August, 1990. Jacobs required constant care and supervision. Church provided that care, with occasional breathers when she employed others to assist.

Jacobs owned funds on deposit in banks, CD's, and her home. Church sold the home under the power of attorney and deposited the proceeds. She used those funds for the care of Jacobs. The sources of the funds and the payments from them are detailed in the commissioner's report (and attachments) and need not be repeated here.

The controversy centers on payments Church made to herself from those funds during the last two years of Jacobs' life. She compensated herself at the rate of $94.00 a day for the home care she provided between August 6, 1990, and July 11, 1992. The total of those payments is $68,244.00.

The case was referred to a commissioner in chancery. After discovery, an evidentiary hearing was held before the commissioner on September 9, 1994. The transcript of that proceeding and the stipulations and exhibits adduced are part of the record.

Thereafter, the commissioner filed his report. As noted above, he detailed the funds under Church's control and the payments made from them. He concluded that Church had expended $68,244.00 for home care. She paid $22,086.00 from her own account to others who assisted from time to time with Jacobs' care. The commissioner recommended that the payments Church made to herself should be disallowed and that monies paid to third-party health care providers should be approved. The commissioner considered and ruled upon other matters, but the court need not address them since neither party took exception to them.

Church filed three exceptions to the report. First, she contends that the commissioner's finding that she must return payments made to herself during 1990 to 1992 is contrary to law. Second, she says that the commissioner's reliance on case authority is "not on point" and "not applicable." Finally, she disputes the assessment of costs against her.

The exceptions were argued on April 17, 1995, and memoranda were submitted. This opinion addresses the exceptions.

*Decision*

### (1) *Viability of the Jackson Case*

Church argues that the commissioner's reliance on *Jackson's Adm'r v. Jackson*, 96 Va. 165 (1898), is misguided because that decision, almost a century old, should not be considered viable precedent. For the reasons that follow, the court rejects the argument.

It is settled that in the absence of an express contract, a child cannot recover for services rendered a parent, the presumption being that such services were performed in recognition of a filial duty. 14A M.J., *Parent and Child*, § 26. In cases where compensation is claimed for services rendered near relatives, especially a child rendering care to a parent, the law will not imply a promise. An actual promise must be proved or facts and circumstances must be shown from which a promise or clear understanding about compensation can be reasonably inferred.

In *Jackson*, the Supreme Court of Virginia adopted this well-settled principle. The Court stated:

> It is not enough to establish a moral obligation to pay for [the services], but an actual promise must be proved or facts from which such promise can be reasonably inferred, established by evidence so clear, direct and explicit as to leave no doubt as to the understanding and intention of the parties . . . . It must be

shown that the deceased intended to and did assume a legal obligation to the [child] of such a character that it could be legally enforced against him.

The Court cited numerous cases from other jurisdictions stating the same proposition, including this comment from a Pennsylvania decision: "The question always is whether the parties contemplated payment and dealt with each other as debtor and creditor." In addition, the Court observed that the principle is supported by "law writers," i.e. legal texts and authorities.

Although Church eloquently describes the many medical and societal changes that influence the manner by which the elderly now are cared for during their final illnesses, she can point to no case in this or any other jurisdiction in which a court has abandoned the *Jackson* rationale. In fact, there surely can be no doubt that the premise that underlies the principal is extant in modern society: services performed by a child to an aging parent are presumably rendered in obedience to natural promptings of love and affection, loyalty, and filial duty, rather than upon an expectation of compensation.

For these reasons, the court cannot accept Church's argument that *Jackson* should be overruled and that a new rule, purportedly more reflective of contemporary societal norms, should be fashioned.

### (2) *Applicability of the Jackson Case*

Church contends that even if *Jackson* is viable precedent, the facts of the case make it inapplicable here. More specifically, Church points out that in *Jackson* the child (actually a grandson) resided with the decedent rather than the other way around, as here; and, second, that in *Jackson*, the child was providing care that resembled "normal household duties" for that era rather than the intensive personal care provided by Church to her mother.

The court acknowledges these distinctions but finds that they do not significantly affect the principal espoused in *Jackson* or its breadth. Applicability of the rule, adopted by almost all the authorities, does not depend on the place where services were rendered or the type of services performed. The premise remains the same and so does the bar against implying promises of compensation in such instances.

### (3) *Express Contract, or Facts from Which A Promise Can Be Inferred*

Church contends that the commissioner ignored facts in evidence from which a promise of compensation can be inferred. However, she points to no testimony, because there is none, that Jacobs promised Church or agreed with Church to compensate her *per diem* for care rendered in the latter's home. Simply put, no such promise was made and no such agreement was reached. Neither Jacobs nor Church ever viewed their relationship as that of debtor-creditor.

An "inference" is a process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts already proved or admitted. See *Black's Law Dictionary* (4th ed.), p. 917.

In this case, the proposition that Church seeks to establish by deduction from other facts proved is that she and her mother had an agreement or understanding that Jacobs would compensate Church *per diem* for home care. If no such agreement or understanding really existed, inferences drawn from other facts lead nowhere. An inference is not an implication. In this sort of case, as we have seen, the court cannot imply a contract as a substitute for an express contract where no contract exists. An inference is not a presumption. The law does not presume a promise or an agreement under these circumstances; in fact, as explained above, the law presumes quite the contrary.

The commissioner found that no contract existed or, at least, that Church had failed to carry her burden of proving that a contract existed or that a promise for compensation was made. The court agrees with the commissioner.

### (4) *Weight of Commissioner's Report*

A commissioner's report does not have the weight given to a jury's verdict. Virginia Code § 8.01-610. Nevertheless, it is entitled to respect and where, as here, the evidence was taken in his presence, his findings upon conflicting evidence should be sustained unless they are not supported by the record. *Higgins v. Higgins*, 205 Va. 324 (1964); *Morris v. U.V.B.*, 237 Va. 331 (1989). It has been said that a commissioner's findings of fact come to the court armed with a presumption of correctness and should not be disturbed unless it plainly appears that they are not supported by the evidence.

In this case, the commissioner's findings are supported by the evidence, and he has applied correct principles of law to those facts.

### (5) *The Power of Attorney*

That Church was Jacob's attorney-in-fact under a valid power of attorney neither adds nor subtracts anything from the analysis. The power contains standard language. It makes no provision for compensation. Although a power of attorney creates an agency relationship between the maker/grantor of the power and the attorney-in-fact, and normally an agent is entitled to reasonable compensation for services rendered, such is not the case where the agency relationship is between parent and child, absent a contrary understanding. See *Restatement of the Law, Agency 2d*, § 441, and comments.

Further, it is an untenable stretch to argue that Church cared for her mother *as agent* for her mother. In other words, the compensation in controversy was not paid as a result of acts performed by Church on behalf of Jacobs under the power of attorney. This is in contrast to the many acts that Church did perform as agent for her mother, dealing with third parties, for which the commissioner correctly found no justification for repayment. Those acts, including expenditures to third parties for the mother and the sale of the mother's property, have been accounted for and approved, and the executor took no exception.

### Conclusion

The commissioner's report will be confirmed in all respects, including his recommendations as to assessment of costs. The commissioner's fee is approved and will be assessed as a cost of this proceeding.